# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| STRICTLY F/X L.L.C., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Case No. _____ |
| | ) |
| KIMBERLY AUSTGEN, | ) |
| JEFFREY CHIPMAN, | ) JURY DEMANDED |
| DAVID KENNEDY, | ) |
| KAMICKA PAIGE MCMURTRY, and | ) |
| CAROLINE SCALERA | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Strictly F/X L.L.C. ("Strictly FX") brings this Complaint against Kimberly Austgen, Jeffrey Chipman, David Kennedy, Kamicka Paige McMurtry, and Caroline Scalera (collectively, "Defendants").

## NATURE OF THE ACTION

1. Strictly FX is one of the largest laser and live special effects companies in the world. Strictly FX uses pyrotechnics, fog screen generators, smoke jets, lasers, and flames to create special effects for Grammy-award winning artists, professional sports and wrestling leagues, and other premiere entertainment events.

2. Strictly FX has spent over twenty-five years developing and refining both the creative and technical sides of its business along with its long-term client relationships.

3. A well-trained, highly-skilled, stable workforce is at the core of Strictly FX's success. Strictly FX's work requires massive operations behind the scenes, including design staff, technical staff, performance crews, and permitting teams, among others.

4. Strictly FX commits an extraordinary amount of time and resources to talent development to ensure its personnel are fully equipped to handle all unique aspects of the live special effects industry.

5. Strictly FX and its employees recognize that developing and retaining this talent requires an extensive investment of resources, and that such employees are not easily replaced.

6. For this reason, Strictly FX and its employees enter into written agreements that specifically cover non-solicitation of Strictly FX employees. Both during their employment at Strictly FX and for two years after any such employment ends, Strictly FX employees agree not to solicit, recruit, employ, or offer to employ any employee of Strictly FX in a competitive business.

7. Strictly FX also takes all reasonable precautions to safeguard its confidential, proprietary information. Strictly FX protects its own and its clients' confidential information, as it often becomes privy to the confidential information of famous musicians, rock bands, and entertainment organizations through its work.

8. For this reason, Strictly FX and its employees also enter into written agreements that require employees to maintain the confidentiality of Strictly FX's confidential information.

9. Former Strictly FX employee Kimberly Austgen made these agreements on June 27, 2017.

10. Former Strictly FX employee Jeffrey Chipman made these agreements on November 7, 2022.

11. Former Strictly FX employee Kamicka "Paige" McMurtry made these agreements on September 18, 2023 and again on November 11, 2024.

12. Former Strictly FX employee Caroline Scalera made these agreements on September 14, 2023 and again on October 28, 2024.

2

13. Strictly FX ended Defendant Austgen's employment in June 2024.

14. Defendant Chipman resigned from Strictly FX on March 15, 2024.

15. Defendant Kennedy resigned from Strictly FX on October 21, 2024.

16. Defendant McMurtry resigned from Strictly FX on October 13, 2025.

17. Defendant Scalera resigned from Strictly FX on October 23, 2025.

18. These Defendants have had no regard for their non-solicitation obligations to Strictly FX.

19. Specifically, four of these Defendants—Defendant Austgen, Defendant Kennedy, Defendant McMurtry, and Defendant Scalera—went to work for Strictly FX's competitor, Pyrotecnico F/X LLC ("Pyrotecnico").

20. Defendant Austgen, Defendant Kennedy, Defendant McMurtry, and Defendant Scalera have been eager to assist their new employer Pyrotecnico in expanding its live-effects business with the very employees they agreed not to solicit or recruit: those Strictly FX went to great expense to hire, train, and retain.

21. Defendant Chipman has solicited Strictly FX employees to work at Pyrotecnico as well.

22. Defendant Scalera also has had no regard for her obligations to maintain the confidentiality of Strictly FX's confidential information.

23. During her final days of employment, Defendant Scalera emailed Strictly FX confidential information to herself at her private email account. The only purpose for doing so was so Defendant Scalera could use that confidential information in her new position at Pyrotecnico.

24. Strictly FX brings this suit to prevent all Defendants from continuing their wrongful conduct and to recover damages and other relief.

3

## PARTIES

25. Strictly FX is a Delaware limited liability company with its principal place of business in Nashville, Tennessee.

26. Upon information and belief, Defendant Austgen is a citizen of the state of Tennessee.

27. Upon information and belief, Defendant Chipman is a citizen of the state of Tennessee.

28. Upon information and belief, Defendant Kennedy is a citizen of the state of Illinois.

29. Upon information and belief, Defendant McMurtry is a citizen of the state of Tennessee.

30. Upon information and belief, Defendant Scalera is a citizen of the state of Tennessee.

## JURISDICTION AND VENUE

31. This Court has jurisdiction over this matter under 28 U.S.C. § 1331, as this case involves, among other things, the application of a federal statute, the Defend Trade Secrets Act, 18 U.S.C. § 1836(c).

32. This Court has jurisdiction over this proceeding to the extent it involves state law claims as a result of its supplemental jurisdiction pursuant to 28 U.S.C. § 1367; such claims are so closely related to the Defend Trade Secrets Act claim that they are part of the same case and controversy.

33. This Court has personal jurisdiction over Defendants Austgen, Chipman, McMurtry, and Scalera because, upon information and belief, they are citizens of Tennessee.

34. Further, this Court has personal jurisdiction over Defendants because Defendants worked for Strictly FX and therefore entered into contracts and conducted business within

4

Tennessee. Strictly FX's principal place of business is located in Nashville, Tennessee, and Strictly FX is a citizen of Tennessee because one of its members is a citizen of Tennessee. Also, Defendants' breaches of contract and tortious conduct occurred within Tennessee and were directed at Strictly FX, which is located in Tennessee.

35. Venue is proper in the Middle District of Tennessee, pursuant to 28 U.S.C. 1391(b) because all or a substantial part of the events giving rise to this claim occurred in this District.

36. Further, with respect to Defendant Scalera, she agreed that any action or proceeding to enforce her Confidentiality and Proprietary Rights Agreement with Strictly FX "shall be brought only in any state or federal court located in the state of Tennessee, county of Davidson." This is such an action.

## STATEMENT OF FACTS

**I.      Strictly FX's Preeminent Place in the Entertainment Industry**

37. Strictly FX is one of the largest laser and special effects companies in the world.

38. For the better part of three decades, Strictly FX has designed and produced live special effects for entertainment events in stadiums, arenas, concert venues, and amphitheaters. Strictly FX has designed and produced these events for an exclusive list of artists and organizations, including Kendrick Lamar, Jelly Roll, Travis Scott, Justin Bieber, Drake, Kanye West, Carrie Underwood, Luke Bryan, the Spice Girls, Coldplay, MTV, the National Football League, and World Wrestling Entertainment, Inc.

39. Strictly FX creates never-before-seen live special effects using lasers, pyrotechnics, smoke jets, fog generators, and flames.

40. Strictly FX is only able to create these show-stopping experiences for clients and fans because it has spent more than twenty-five years and great financial expense developing its methods, designs, and processes; its relationships with performers and organizations in the

5

entertainment industry; and—critically—*its workforce* of highly-trained employees. Strictly FX's workforce and the proprietary, confidential information it has spent decades developing (and protecting) are the cornerstone of its business.

**II.      Strictly FX's Employee Agreements**

41.      Strictly FX requires employees to sign an Employee Confidentiality and Non-Solicitation Agreement (the "Non-Solicit Agreement") and, for certain employees, a Confidentiality and Proprietary Rights Agreement (the "Confidentiality Agreement"). *See* **Ex. A** (Austgen Non-Solicit Agreement); **Ex. B** (Chipman Non-Solicit Agreement); **Ex. C** (McMurtry Non-Solicit Agreement); **Ex. D** (McMurtry Confidentiality Agreement); **Ex. E** (Scalera Non-Solicit Agreement); **Ex. F** (Scalera Confidentiality Agreement).

42.      Employees may not on behalf of themselves or another entity "solicit, recruit, employ, or offer to employ, any employee of Strictly FX in or for any business the same as, or competitive with, the business of Strictly FX" during employment and for a period of two years following any termination. *See* **Ex. E**  ¶ 4.[1]

43.      The Non-Solicit Agreement's enforcement terms are clear. *See id.* ¶ 5.

44.      Employees acknowledge that any breach of the Agreement will cause substantial and irreparable harm to Strictly FX, for which money damages alone would be an inadequate remedy. *Id.*

45.      Therefore, in the event of any breach, the Non-Solicit Agreement provides that Strictly FX is entitled to immediate injunctive relief. *Id.* ¶ 5(a).

---

[1] Strictly FX cites generally to **Exhibit E**, Ms. Scalera's Non-Solicit Agreement, but the Non-Solicit Agreements are materially identical for all Defendants.

6

46. The Non-Solicit Agreement also provides for liquidated damages because "it is extremely difficult, if not impossible, to ascertain the extent of the monetary damages that would be caused by any breach by Employee of the restrictive covenants of this Agreement." *Id.* ¶ 5(b).

47. Strictly FX "shall be compensated by a payment" of $100,000 for "any" breach of the Non-Solicit Agreement. *Id.*

48. Further, Strictly FX "shall be entitled to payment of its costs, including reasonable attorney fees, from Employee" if Strictly FX "prevails in any court action to enforce the provisions of this Agreement." *Id.* ¶ 5.

49. Certain employees, like Defendant Scalera, also sign the Confidentiality Agreement.

50. Pursuant to the Confidentiality Agreement, employees and Strictly FX agree that Strictly FX is in the business of "marketing, developing, producing, providing, managing, and sourcing live special effects" and related products, technology, services and supplies for clients in the entertainment industry. **Ex. F**[2] at 1.

51. Employees who sign the Confidentiality Agreement agree that Strictly FX has "a proprietary interest in, among other items and information, its documents, methods, techniques, processes, and client and supplier information, including its client lists, supplier lists and marketing/pricing strategies." *Id.*

52. Employees who sign the Confidentiality Agreement further agree that they will only "have access to Strictly FX's confidential and proprietary information in the course" of their employment with Strictly FX. *Id.*

---

[2] Strictly FX cites generally to **Exhibit F**, Ms. Scalera's Confidentiality Agreement, because Ms. Scalera's and Ms. McMurtry's Confidentiality Agreements are materially identical.

7

53. Under the Confidentiality Agreement, employees agree to "treat all Confidential Information[3] as strictly confidential"; not to disclose or use Confidential Information, except as required by their Strictly FX employment duties; and not to copy or remove any Confidential Information from the control of Strictly FX. *See id.* ¶ 1(a)-(b).

54. An employee's obligation to maintain the confidentiality of Confidential Information only expires if the information becomes public (by means other than a breach of the Confidentiality Agreement). *Id.* ¶ 1(c).

55. Strictly FX and employees who sign the Confidentiality Agreement agree that Confidential Information is "of great competitive importance and commercial value to Strictly FX" and that disclosure "will cause irreparable harm." *Id.* ¶ 6. Strictly FX and employees further agree that in the event of a breach, Strictly FX is entitled to equable relief, including a temporary and permanent injunction, and other legal remedies, including monetary damages. *See id.*

---

[3] The Confidentiality Agreement defines confidential information as including, but not limited to "all information not generally known to the public, in spoken, printed, electronic, or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, computer programs, computer software, applications, operating systems, software design, web design, work-in-process, databases, device configurations, embedded data, compilations, metadata, technologies, manuals, records, articles, systems, material, sources of material, supplier information, vendor information, financial information, results, accounting information, accounting records, legal information, marketing information, advertising information, pricing information, credit information, design information, payroll information, staffing information, personnel information, information about Strictly FX principals, employee lists, supplier lists, vendor lists, contractor lists, developments, reports, internal controls, security procedures, graphics, drawings, sketches, sales information, revenue, costs, formulae, notes, communications, product plans, designs, styles, models, ideas, audiovisual programs, unpublished patent applications, original works of authorship, specifications, customer information, customer lists, client information, client lists, buyer lists" among other information. **Ex. F** ¶ 1(a).

### III. Defendant Austgen's Breaches of the Non-Solicit Agreement

56. Defendant Austgen began working for Strictly FX in 2015. She held many titles and had many areas of responsibility at Strictly FX during her tenure. She was responsible for the scheduling of on-site crews, she was a Logistics Lead for account managers and customer interfacing, she was a Procurement Leader, she oversaw Strictly FX's quoting process and contract management, and she was a Nashville Site Manager, which included many managerial and leadership responsibilities.

57. Defendant Austgen signed the Non-Solicit Agreement, a valid contract described above, on June 27, 2017. **Ex. A**. Following her execution of the Non-Solicit Agreement, Defendant Austgen received employment, compensation, and benefits, and she continued to work for Strictly FX for nearly eight more years.

58. Defendant Austgen's positions at Strictly FX afforded her access to some of the company's most valued assets: Strictly FX's employees and their capabilities and compensation, Strictly FX's contract terms and pricing details, and Strictly FX's general "playbook" for producing large, live-scale events. Strictly FX made all of this information and access available to Defendant Austgen in reliance on her promises in the Non-Solicit Agreement.

59. In June 2024, Strictly FX ended Defendant Austgen's employment. Strictly FX reviewed the Non-Solicit Agreement with Defendant Austgen upon her termination and included a hardcopy of the Non-Solicit Agreement with Defendant Austgen's severance materials.

60. Defendant Austgen wasted no time going to work for Strictly FX's direct competitor, Pyrotecnico.

61. And even though she was prohibited from doing so until June 2026, Defendant Austgen began recruiting and soliciting Strictly FX employees on behalf of Pyrotecnico in violation of her Non-Solicit Agreement.

9

62. Strictly FX has learned that Defendant Austgen disregarded her contractual promises and violated the Non-Solicit Agreement on multiple occasions.

63. In 2025, Defendant Austgen directly solicited Strictly FX employee Paige McMurtry to work for Pyrotecnico.

64. A former Strictly FX employee described the solicitation to a current Strictly FX employee: "Paige accepted a job at [P]yrotecnico … **Kim [Austgen] reached out to her** … But Paige hasn't told [Strictly FX] she's going there, she just said she's moving back to Atlanta."



65. Defendant McMurtry indeed left Strictly FX's employment and, without Strictly FX's knowledge, joined Pyrotecnico as a direct result of Defendant Austgen's solicitation and recruitment.

66. On November 17, 2025, Strictly FX sent a cease-and-desist letter to Defendant Austgen, reminding her of her obligations under the Non-Solicit Agreement and Strictly FX's intention to enforce each provision.

10

67. Despite repeated warnings, in January 2026, Strictly FX learned that Defendant Austgen continued to solicit Strictly FX employees, including members of its touring crew, to work for Pyrotecnico.

68. Strictly FX sent *another* letter on January 30, 2026 demanding Defendant Austgen **"cease and desist any and all contact with and solicitation of Strictly FX's employees**."

69. To avoid litigation, Strictly FX requested that Defendant Austgen confirm by February 6, 2026 that she would comply with certain terms outlined in the letter.

70. Defendant Austgen never responded.

**IV.    Defendant McMurtry's Breaches of the Non-Solicit Agreement**

71. Beginning in September 2023, Defendant McMurtry worked for Strictly FX as a Permit Coordinator. A Permit Coordinator is responsible for acquiring laser, pyrotechnic, flame, carbon dioxide ("$CO_2$") and other permits from federal, state, city, and sometimes international agencies for individual shows, tours, and one-time live events. A Permit Coordinator handles all aspects of applying for the requisite permits, communicating with local agencies, and coordinating with local law enforcement or fire departments.

72. Prior to working for Strictly FX, Defendant McMurtry had no experience in permit processing or procurement. Strictly FX invested significant time and resources in training McMurtry to ensure she could successfully perform her job duties. This training enabled McMurtry to understand and operate Strictly FX's equipment, navigate applicable local laws and regulations throughout North America, and coordinate with demanding fire marshals and authorities having jurisdiction ("AHJs") to ensure that Strictly FX's complex productions ran smoothly.

73. Defendant McMurtry signed the Non-Solicit Agreement, a valid contract described above, on September 18, 2023. **Ex. C**. Following her execution of the Non-Solicit Agreement,

11

Defendant McMurtry received employment, compensation, and benefits, and she continued to work for Strictly FX for over two more years.

74. On October 13, 2025, Defendant McMurtry gave Strictly FX notice that she was resigning under the false pretenses that she was relocating to Georgia.

75. On November 5, 2025, Strictly FX emailed Defendant McMurtry, attached a copy of the Non-Solicit Agreement, and reminded her that she was "also bound by the Non-Solicitation Agreement, which prohibits the solicitation of Strictly FX employees, clients, or business partners for a period of 2 years following your exit from Strictly FX."

76. The real reason for Defendant McMurtry's departure, however, was that Defendant Austgen had recruited and solicited her to work for Pyrotecnico.

77. Even though she had been wrongfully recruited and solicited herself, Defendant McMurtry violated her own Non-Solicit Agreement that prohibited her from soliciting or recruiting Strictly FX employees to work at Pyrotecnico.

78. Strictly FX has learned that, like Defendant Austgen, Defendant McMurtry disregarded her contractual promises and violated the Non-Solicit Agreement on multiple occasions.

79. Upon information and belief, Defendant McMurtry recruited and solicited Defendant Scalera to work at Pyrotecnico, in violation of the Non-Solicit Agreement.

80. On November 17, 2025, Strictly FX sent a cease-and-desist letter to Defendant McMurtry, reminding her of her obligations under the Non-Solicit Agreement and Strictly FX's intention to enforce each provision.

12

**V.     Defendant Scalera's Breaches of the Non-Solicit Agreement and Confidentiality Agreement**

81.     Beginning in September 2023, Defendant Scalera worked as Strictly FX's Lead Permit Coordinator. As mentioned above, a Permit Coordinator is responsible for acquiring laser, pyrotechnic, flame, $CO_2$ and other permits from federal, state, city, and sometimes international agencies for individual shows, tours, and one-time live events. A Permit Coordinator handles all aspects of applying for the requisite permits, communicating with local agencies, and coordinating with local law enforcement or fire departments. As Lead Permit Coordinator, Defendant Scalera had day-to-day oversight of permitting, timing, and processing and reported to the VP of Production with deliverables.

82.     Strictly FX vested in Defendant Scalera the responsibility to serve as the primary point of contact for federal, state, and local permitting offices and vested in her the authority to make planning, operational, and financial decisions on behalf of the company.

83.     Prior to working at Strictly FX, Defendant Scalera had no experience in permit coordinating, processing, or procurement. Strictly FX invested significant time and resources in training Scalera to ensure she could successfully perform her job duties. This training enabled Scalera to understand and operate Strictly FX's equipment, navigate applicable local laws and regulations throughout North America, and coordinate with demanding fire marshals and authorities having jurisdiction ("AHJs") to ensure that Strictly FX's complex productions ran smoothly.

84.     Defendant Scalera signed the Non-Solicit Agreement, a valid contract described above, on September 14, 2023. **Ex. E**. Following her execution of the Non-Solicit Agreement, Defendant Scalera received employment, compensation, and benefits, and she continued to work for Strictly FX for over two more years.

13

85. Defendant Scalera also signed the Confidentiality Agreement on October 28, 2024. Following her execution of the Confidentiality Agreement, Defendant Scalera received ongoing employment, compensation, and benefits, and she continued to work for Strictly FX for an additional year.

86. On October 23, 2025, Defendant Scalera gave Strictly FX notice that she was resigning under the false pretenses that she was relocating to Florida.

87. The real reason for her departure, however, was that Defendant Austgen had directly or indirectly recruited and solicited her to work for Pyrotecnico.

88. Defendant Scalera's cover letter to Pyrotecnico enclosing her resume made clear that she was "sending [her] resume at the suggestion of a former colleague."

> October 17, 2025
>
> Dear Sir/Madam,
>
> I am currently employed as the Lead Permit Coordinator for a special effects company in the Nashville area since 2023. I am interested in discussing the Permit Coordinator FX position. I am sending my resume at the suggestion of a former colleague.
>
> If you are interested in discussing this position further, please feel free to call, text or email.
>
> Thank you,
>
> Caroline Scalera

89. Strictly FX was unaware at the time but eventually located the letter above in Defendant Scalera's deleted email folder.

90. When a Strictly FX coworker congratulated Defendant Scalera on October 29, 2025 via a message platform, Defendant Scalera responded that she "wasn't looking for a position but couldn't turn this one away!"

14



91. During the final days of her employment with Strictly FX (and unbeknownst to Strictly FX at the time), Defendant Scalera violated the Confidentiality Agreement and emailed Confidential Information from Strictly FX to her personal email account. These impermissible disclosures included confidential and proprietary information regarding the handling of flame retardants and flame certifications, vendor information, and a confidential and proprietary demo video.

92. There is only one explanation for Defendant Scalera sending herself Strictly FX Confidential Information in the final days of her employment: she disclosed the information to herself to use in her new position at Pyrotecnico.

93. On November 6, 2025, Strictly FX emailed Defendant Scalera and reminded her of her obligations to Strictly FX, including confidentiality obligations and her agreement not to solicit or recruit Strictly FX employees for two years.

94. Even though she had been wrongfully recruited and solicited herself, Defendant Scalera also violated her own Non-Solicit Agreement that prohibited her from soliciting or recruiting Strictly FX employees to work at Pyrotecnico.

95. Strictly FX has learned that, like Defendant Austgen and Defendant McMurtry, Defendant Scalera has disregarded her contractual promises and violated the Non-Solicit Agreement on multiple occasions.

96. Upon information and belief, Defendant Scalera has attempted to recruit and solicit Strictly FX employees to work for Pyrotecnico, in violation of her the Non-Solicit Agreement.

15

97. On November 17, 2025, Strictly FX sent a cease-and-desist letter to Defendant Scalera, reminding her of her obligations under the Non-Solicit and Confidentiality Agreements and Strictly FX's intention to enforce each provision.

98. Despite repeated warnings, in January 2026, Strictly FX learned that Defendant Scalera had continued to solicit Strictly FX employees, including members of its touring crew, to work for Pyrotecnico.

99. Strictly FX sent *another* letter on January 30, 2026 demanding that Defendant Scalera "**cease and desist any and all contact with and solicitation of Strictly FX's employees**."

100. To avoid litigation, Strictly FX requested that Defendant Scalera confirm by February 6, 2026 that she would comply with certain terms outlined in the letter.

101. Defendant Scalera never provided the requested assurances.

## VI. Defendant Chipman's Breaches of the Non-Solicit Agreement and Defendant Kennedy's Tortious Conduct

102. Beginning on June 12, 2023, Defendant Chipman worked as a Senior Accountant.

103. Prior to working at Strictly FX, Defendant Chipman had only limited experience in the special effects industry. Strictly FX trained Defendant Chipman extensively on all of Strictly FX's equipment, crew, clients, and the unique operating systems to ensure his success at the company.

104. Defendant Chipman signed the Non-Solicit Agreement, a valid contract described above, on November 7, 2022. **Ex. B**. Following his execution of the Non-Solicit Agreement, Defendant Chipman received employment, compensation, and benefits, and continued to work for Strictly until March 2024.

105. Defendant Kennedy worked for Strictly FX for over twenty-seven (27) years as an Account Manager, heavily focused on the laser effects portion of Strictly FX's business. Prior to

16

working at Strictly FX, Defendant Kennedy had limited experience in the special effects industry. Strictly FX provided Defendant Kennedy with extensive training in special effects, lasers, client management, and broader artistic skills necessary to ensure success in his role.

106. Defendant Kennedy left Strictly FX on October 21, 2024 and went to work for Pyrotecnico.

107. Strictly FX has learned that, like Defendant Austgen, Defendant McMurtry, and Defendant Scalera,  Defendant Chipman has disregarded his contractual promises and violated the Non-Solicit Agreement on multiple occasions.

108. Strictly FX also has learned that Defendant Kennedy is conspiring with Defendant Chipman (and others) to recruit and solicit Strictly FX employees for Pyrotecnico.

109. Strictly FX uncovered employee chat messages from October 2025 that reveal "**DK** [David Kennedy] **is calling people in our office to come work for Pyrotecnico**."

110. The messages continue and reveal that Defendant Kennedy and "Chip [Defendant Chipman] are double teaming people[.]"

Sandy Gonzalez <sgonzalez@strictlyfx.com>   10/9/2025   3:42 PM

Doug, did you know DK is calling people in our office to come work for pyrotecnico? 😆

Doug Cenko <doug@strictlyfx.com>   10/9/2025   3:51 PM

Oh brother. No he's not. Who's he calling?

Sandy Gonzalez <sgonzalez@strictlyfx.com>   10/9/2025   3:52 PM

Him and Chip are double teaming people haha

111.     On February 28, 2026, Strictly FX's founder and CEO received an anonymous email confirming that "several ex-employees [] are working against you" and waiting for their Agreements to expire to "take some of your biggest accounts." The email warned that these individuals "know your current team signed new agreements, but [are] still communicating with them … [y]our ex employees are about to rip everything from you and the previous note they received is considered a joke … [t]hey discussed this at the opening event in Nashville and other events a few weeks ago."

112.     The anonymous email further warned Strictly FX's CEO that "Pyrotechnico [sic] is going to do a lot of damage and this will be via your ex employees … [y]ou are about to lose a lot."

From: truthfactor11111@proton.me <truthfactor11111@proton.me>
Sent: Saturday, February 28, 2026 3:19 PM
To: Ted Maccabee <tmaccabee@strictlyfx.com>
Subject: NDA Warning

Hey Ted,

I'm sending you this email as a heads up to what is going on and I don't agree with it. You have several ex-employees that are working against you. They are working with your current clients and vendors to push you out. (Ex:Coldplay) Waiting for the moment the existing NDA expires to basically take some of your biggest accounts. They know your current team signed new agreements, but still communicating with them. I don't like the way this is being handled. Your ex employees are about to rip everything from you and the previous notice they received is considered a joke. They discussed this at the opening event in Nashville and other events a few weeks ago. Pyrotechnico is going to do a lot of damage and this will be via your ex-employees and Pyrotechnico leadership. How many people that used to work for you work there now? How does Rocco and Bob Ross play into it? You are about to lose a lot.

## COUNT I
### Breach of Contract – Non-Solicitation Agreement
### (Defendants Austgen, McMurtry, Scalera, Chipman)

113. Strictly FX incorporates and re-alleges each paragraph above as if set forth in full in Count I.

114. Defendants Austgen, McMurtry, Scalera, and Chipman entered into valid and enforceable Agreements with Strictly FX.

115. Defendants Austgen, McMurtry, Scalera, and Chipman signed the Non-Solicit Agreements and agreed that they would not solicit Strictly FX employees for a period of two years following termination of their employment with Strictly FX.

116. The Non-Solicit Agreements are valid contracts, Strictly FX has complied with its obligations under the Non-Solicit Agreements, and the Non-Solicit Agreements' restrictive covenants are reasonable and enforceable.

117. The non-solicitation restrictive covenant is sufficiently tailored to protect Strictly FX's legitimate business interest of protecting the extraordinary investment Strictly FX makes in its employees as it trains and develops their skills in the highly unique live special effects industry.

118. The non-solicitation provision permits Defendants Austgen, McMurtry, Scalera, and Chipman to carry on in this same industry anywhere they please, and the provision poses no injury to the public.

19

119. In exchange for the promises Defendants Austgen, McMurtry, Scalera, and Chipman made in the Non-Solicit Agreements, they received ongoing employment, compensation, and benefits.

120. When Strictly FX provided Defendants Austgen, McMurtry, Scalera, and Chipman with employment, benefits, and compensation, Strictly FX complied with and performed all of its obligations under the Non-Solicit Agreements.

121. Following their separations from Strictly FX, the Non-Solicit Agreements prohibited Defendants Austgen, McMurtry, Scalera, and Chipman, on behalf of themselves, Pyrotecnico, or any other competitor, from soliciting, recruiting, employing, or offering to employ any employee of Strictly FX for a period of two years.

122. Defendants Austgen, McMurtry, Scalera, and Chipman have each violated their respective Non-Solicit Agreements multiple times by recruiting, soliciting, attempting to recruit, and attempting to solicit *multiple* Strictly FX employees to work at Pyrotecnico within the prohibited two year period.

123. As a result of Defendants' breaches of the Non-Solicit Agreements, Strictly FX has and will continue to sustain actual damage and irreparable harm.

For each breach of the Non-Solicit Agreement, Strictly FX is entitled to $100,000 in liquidated damages and the attorneys' fees and costs that Strictly FX incurs in enforcing the Non-Solicit Agreement.

## COUNT II
### Breach of Contract – Confidentiality Agreement
### (Defendant Scalera)

125. Strictly FX incorporates and re-alleges each paragraph above as if set forth in full in Count II.

126. Defendant Scalera entered into a valid Confidentiality Agreement with Strictly FX on October 28, 2024.

127. Defendant Scalera signed the Confidentiality Agreement and agreed that she would comply with Strictly FX's guidelines to protect Strictly FX's Confidential Information.

128. The Confidentiality Agreement is a valid contract, Strictly FX has complied with its obligations under the Confidentiality Agreement, and the Confidentiality Agreement's restrictive covenants are reasonable and enforceable.

129. The restrictive covenants are sufficiently tailored to protect Strictly FX's legitimate business interest of protecting its Confidential Information that took decades to develop and to which employees only have access to because of their employment with Strictly FX. The provisions permit Defendant Scalera to carry on in this same industry anywhere she pleases, and they pose no injury to the public. In exchange for the promises Defendant Scalera made in the Confidentiality Agreement, she received continued employment, benefits, and additional, significant compensation.

130. When Strictly FX provided Defendant Scalera continued employment, benefits, additional compensation, and access to the relevant Confidential Information to perform her job duties, Strictly FX complied with all of its obligations under this valid contract.

131. Following termination, the Confidentiality Agreement prohibited Defendant Scalera from disclosing or using Strictly FX Confidential Information, which includes information about Strictly FX's methods, techniques, process, products, trade secrets, proprietary information, operational and financial data, product and process specifications and related costs, marketing methods, and systems and procedures.

132.     Defendant Scalera breached the Confidentiality Agreement when she forwarded emails to her personal email account containing proprietary, confidential information relating to the handling of flame retardants and flame certifications, vendor information, and a confidential and proprietary demo video.

133.     There is only one reason Defendant Scalera would have forwarded Strictly FX Confidential Information to herself in the final days of her employment: she planned to use the information in her new position at Pyrotecnico.

134.     As a result of Defendant Scalera's breaches of the Confidentiality Agreement, Strictly FX has and will continue to sustain actual damage and irreparable harm.

## COUNT III
### Tortious Interference with Contract
### (All Defendants)

135.     Strictly FX incorporates and re-alleges each paragraph above as if set forth in full in Count III.

136.     Defendants Austgen, McMurtry, Scalera, and Chipman entered into their respective Non-Solicit Agreements with Strictly FX, which are valid and enforceable contracts.

137.     Defendants Austgen, McMurtry, Scalera, and Chipman were aware that each other had entered into the Non-Solicit Agreements and that the Non-Solicit Agreements contained a two-year prohibition on solicitation following the termination of employment with Strictly FX.

138.     Defendant Kennedy was aware of the Non-Solicit Agreements and the two-year prohibition on solicitation following the termination of employment with Strictly FX.

139.     Defendant Kennedy induced Defendant Chipman to breach his Non-Solicit Agreement when they intentionally "double team[ed]" and contacted Strictly FX employees to try

to recruit and solicit them to work for Pyrotecnico. Defendant Kennedy's inducement was intentional and unjustified.

140. Upon information and belief, Defendant Kennedy and all Defendants induced breaches of the Non-Solicit Agreements when they intentionally encouraged each other and worked together to try to recruit and solicit Strictly FX employees to work for Pyrotecnico within the prohibited two year period. These inducements were intentional and unjustified.

141. As a direct result of the intentional and unjustified inducements, Defendants Austgen, McMurtry, Scalera, and Chipman breached their Non-Solicit Agreements. As a result of Defendants' tortious interference with the Non-Solicit Agreements, Strictly FX has and will continue to sustain actual damage and irreparable harm.

## COUNT IV
### Civil Conspiracy
### (All Defendants)

143. Strictly FX incorporates and re-alleges each paragraph above as if set forth in full in Count IV.

144. Defendants have conspired to work together to accomplish the unlawful objective of encouraging and inducing each other to breach the Non-Solicit Agreements and recruit and solicit Strictly FX employees to work for Pyrotecnico.

145. Each Defendant has committed the tortious act of tortious interference with contract and intentionally and unjustifiably induced the other Defendants to breach the Non-Solicit Agreements and recruit and solicit Strictly FX employees to work for Pyrotecnico.

146. As a result of Defendants' conspiracy and tortious conduct, Strictly FX has and will continue to sustain actual damage and irreparable harm.

23

**COUNT V**
**Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act**
**18 U.S.C. § 1836 *et seq.***
**(Defendant Scalera)**

147.    Strictly FX incorporates and re-alleges each paragraph above as if set forth in full in Count V.

148.    During Defendant Scalera's employment with Strictly FX, she had access to, and currently is in possession of, certain confidential and proprietary information constituting "trade secrets" as defined by the Defend Trade Secrets Act, 18 U.S.C. § 1836, including, but not limited to, Strictly FX's proprietary, confidential information relating to the handling of flame retardants and flame certifications, vendor information, and confidential and proprietary demo videos. This information is a protectable interest belonging to Strictly FX.

149.    Defendant Scalera misappropriated this information by emailing the information to her personal email account for her use while employed at Strictly FX's competitor, Pyrotecnico.

150.    This information is sufficiently secret to derive economic value from not being generally known to other persons or entities who can obtain economic value from its disclosure or use.

151.    This information is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

152.    Defendant Scalera's current possession and use of, as well as continued future use of, Strictly FX's trade secret information is without Strictly FX's authorization or permission.

153.    The Strictly FX trade secrets misappropriated by Defendant Scalera are related to a product or service used in, or intended for use in, interstate or foreign commerce.

24

154. Defendant Scalera's unauthorized possession, use, and/or disclosure of Strictly FX's trade secret information, actual and threatened, violates the Defend Trade Secrets Act, 18 U.S.C. § 1836.

155. The public policy in favor of the protection of Strictly FX's interest in maintaining its trade secrets outweighs any interest Scalera allegedly may have in using Strictly FX's trade secrets.

156. As a result of the above, Strictly FX has no adequate remedy at law and has suffered and will continue to suffer an imminent risk of further irreparable harm. Therefore, Strictly FX requests that Scalera's activities be enjoined by the Court; that Scalera be required to cease any and all disclosure or use of Strictly FX's confidential information; that Scalera be required to return Strictly FX's documents and information; that Scalera be required to provide a complete accounting of all of Strictly FX's documents and information that Scalera removed or obtained from Strictly FX; and that Scalera be required to provide a complete listing of all individuals with whom she shared and/or to whom she disclosed Strictly FX's confidential information.

157. As a direct and proximate result of Scalera's ongoing misappropriation of Strictly FX's trade secrets and confidential information—conduct that involves use of such information outside the scope permitted by her obligations—Strictly FX has suffered and continues to suffer immediate and irreparable injury, loss, harm, or damage. Strictly FX will continue to suffer these harms unless and until Scalera is restrained from her present conduct and Strictly FX is relieved of the burden of competing against a party improperly using Strictly FX's own trade secrets and confidential information.

158. As a direct and proximate result of Scalera's actual and/or threatened misappropriation of Strictly FX's trade secrets, Strictly FX has suffered and/or will suffer

25

additional damages, which continue to accrue, including, without limitation, attorney's fees and costs related to this litigation, business interruption, and lost business and profits.

**COUNT VI**
**Misappropriation of Trade Secrets in**
**Violation of the Tennessee Uniform Trade Secrets Act**
**Tenn. Code Ann. § 47-25-1701 *et seq.***
**(Defendant Scalera)**

159. Strictly FX incorporates and re-alleges each paragraph above as if set forth in full in Count VI.

160. During Defendant Scalera's employment with Strictly FX, she had access to, and currently is in possession of, certain confidential and proprietary information constituting "trade secrets" as defined by the Tennessee Uniform Trade Secrets Act, § 47-25-1701 ("TUTSA"), including, but not limited to, Strictly FX's proprietary, confidential information relating to the handling of flame retardants and flame certifications, vendor information, and confidential and proprietary demo videos. This information is a protectable interest belonging to Strictly FX.

161. Defendant Scalera misappropriated this information by emailing the information to her personal email account for her use while employed at Strictly FX's competitor, Pyrotecnico.

162. This information is sufficiently secret to derive economic value from not being generally known to other persons or entities who can obtain economic value from its disclosure or use.

163. This information is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

164. Defendant Scalera's current possession and use of, as well as continued future use of, Strictly FX's trade secret information is without Strictly FX's authorization or permission.

165. The Strictly FX trade secrets misappropriated by Defendant Scalera are related to a product or service used in, or intended for use in, interstate or foreign commerce.

166. Defendant Scalera's conduct described herein constitutes willful and malicious misappropriation of Strictly FX's trade secrets under the TUTSA.

167. Defendant Scalera's unauthorized possession, use, and/or disclosure of Strictly FX's trade secret information, actual and threatened, violates the TUTSA.

168. The public policy in favor of the protection of Strictly FX's interest in maintaining its trade secrets outweighs any interest Scalera allegedly may have in using Strictly FX's trade secrets.

169. As a result of the above, Strictly FX has no adequate remedy at law and has suffered and will continue to suffer an imminent risk of further irreparable harm. Therefore, Strictly FX requests that Scalera's activities be enjoined by the Court; that Scalera be required to cease any and all disclosure or use of Strictly FX's confidential information; that Scalera be required to return Strictly FX's documents and information; that Scalera be required to provide a complete accounting of all of Strictly FX's documents and information that Scalera removed or obtained from Strictly FX.

170. As a direct and proximate result of Scalera's ongoing misappropriation of Strictly FX's trade secrets and confidential information—conduct that involves use of such information outside the scope permitted by her obligations—Strictly FX has suffered and continues to suffer immediate and irreparable injury, loss, harm, or damage. Strictly FX will continue to suffer these harms unless and until Scalera is restrained from her present conduct and Strictly FX is relieved of the burden of competing against a party improperly using Strictly FX's own trade secrets and confidential information.

171. As a direct and proximate result of Scalera's actual and/or threatened misappropriation of Strictly FX's trade secrets, Strictly FX has suffered and/or will suffer additional damages, which continue to accrue, including, without limitation, attorney's fees and costs related to this litigation, business interruption, and lost business and profits.

172. In addition, and on information and belief, Scalera's misappropriation was willful and malicious, and Strictly FX is entitled to an award of exemplary damages and attorneys' fees and costs incurred herein pursuant to Tenn. Code Ann. § 47-25-1704 and Tenn. Code Ann. § 47-25-1705.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Strictly FX asks that the Court award Strictly FX:

    a. Injunctive relief to restrain Defendants from further breaching the Non-Solicit Agreements and Confidentiality Agreements and from further misappropriating Strictly FX's trade secrets;

    b. Compensatory, incidental, consequential, and exemplary damages;

    c. Liquidated damages in the amount of $100,000 for each of Defendant Austgen's breaches of the Non-Solicit Agreement;

    d. Liquidated damages in the amount of $100,000 for each of Defendant Chipman's breaches of the Non-Solicit Agreement;

    e. Liquidated damages in the amount of $100,000 for each of Defendant McMurtry's breaches of the Non-Solicit Agreement;

    f. Liquidated damages in the amount of $100,000 for each of Defendant Scalera's breaches of the Non-Solicit Agreement; and

    g. Attorneys' fees, costs, interests, and any other relief the Court deems just.

28

Dated: June 10, 2026

Respectfully submitted,

_/s/ Marc P. Miles_
Marc P. Miles (#39954)
Shook Hardy & Bacon L.L.P.
5 Park Plaza, Suite 1600
Irvine, CA 92614
Email: mmiles@shb.com
Tel: (949) 475-1500
Fax: (949) 475-0016

*Attorneys for Plaintiff Strictly F/X L.L.C.*

## **Demand for Jury Trial**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: June 10, 2026

Respectfully submitted,

_/s/ Marc P. Miles_
Marc P. Miles (#39954)
Shook Hardy & Bacon L.L.P.
5 Park Plaza, Suite 1600
Irvine, CA 92614
Email: mmiles@shb.com
Tel: (949) 475-1500
Fax: (949) 475-0016

Attorneys for Plaintiff Strictly F/X L.L.C.

29